## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **LABORERS' DISTRICT COUNCIL** | * | |
| **HEALTH AND WELFARE TRUST** | * | |
| **FUND NO. 2 et al.,** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | Civil Case No. RWT 03-2196 |
| v. | * | |
| | * | |
| **COMET CONTRACTING, LLC, et al.,** | * | |
| | * | |
| Defendants. | * | |

## <u>MEMORANDUM OPINION</u>

This is an ERISA case that now comes before the Court for decision after a bench trial. The case was brought by a group of employee benefit trust funds ("the Funds") against two related environmental remediation companies, USA Remediation Services, Inc. ("USA"), and Comet Contracting, LLC ("Comet"). Comet was a party to a collective bargaining agreement with the Laborers' District Council of Washington, D.C. and Vicinity, a labor organization that represents (or represents unions that represent) Comet's employees. The agreement, and by incorporation the trust agreements of the Funds, obligated Comet to make timely reports to the Funds of the hours worked by covered employees and to make a monetary contribution to the Funds for each of those hours on behalf of the employees. The Funds brought this action because, they alleged, Comet had failed to fulfill its obligations despite performing work that was covered under the collective bargaining agreement. The Funds joined USA as a defendant because, they alleged, it was an alter ego of Comet.

In its motion for summary judgment, USA challenged its alter ego status and argued that it could not be held liable for Comet's alleged violations of the collective bargaining agreement. Paper

No. 52.  On June 13, 2005, the Court heard argument on and orally granted the motion in part and

denied it in part.  It held that although USA could not be held liable an alter ego of Comet, a second

theory advanced by the Funds, the "single-employer" theory, had been adequately pled (and thus

could be considered) and could survive summary judgment.

The Funds thus proceeded to a bench trial under the single-employer theory.  At the pretrial

conference, the liability and damages phases of trial were bifurcated.  Accordingly, a hearing as to

liability was held on January 12, 2006.  At that hearing, for reasons that will be explained below,

this Court preliminarily found both USA and Comet to be liable.  An Order followed on January 25,

2006, that authorized the Funds to perform an audit of certain of USA's records on or before

February 24, 2006, so as to allow the Funds to establish the amount of contribution and delinquency

payments owed; required the Funds to provide an audit report to USA on or before March 3, 2006;

authorized USA to object to specific audit calculations no more than twenty days later; authorized

USA to depose the Funds' auditor; and set a hearing on damages for April 17, 2006.

At the damages hearing, the Court took this matter under advisement.  This opinion now

explains the Court's findings, first as to liability, then as to damages.  For the reasons that follow,

the Court will, by separate order, enter judgment in favor of the Funds, against both defendants

jointly and severally, in the amount of $1,124,898.

## FINDINGS OF FACT: LIABILITY

Prior to the liability hearing held on January 12, 2006, both Plaintiffs and Defendants

submitted proposed findings of fact and conclusion of law.  *See* Paper No. 78 (Defendants); Paper

No. 79 (Plaintiffs).  These proposals revealed that all material facts were stipulated.  At the hearing,

it was only necessary to hear legal argument as to whether a "bargaining unit" determination was

necessary or within the jurisdiction of the Court—see *infra*—and to work through the proposed findings to distill the agreed-upon facts from the arguments in the pleadings.  On the basis of the proposed findings of fact and the colloquy at the hearing, the Court therefore makes the following findings:

1.     Plaintiff Funds were created and exist pursuant to Agreements and Declarations of Trust entered into between participating employers and union locals affiliated with the Laborers International Union of North America, A.F.L.-C.I.O. ("Laborers").  The Funds are "multi-employer benefit plan[s]" as defined in 29 U.S.C. §§ 1002(3) and (37)(A), and are established and regulated pursuant to Section 302 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 181 *et seq.*, and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq*.

2.     The Funds are jointly administered by employer trustees appointed by the Construction Contractors Council of Washington, D.C., and the Masonry Employers Association of Washington, D.C., and trustees appointed through procedures established by the Laborers.  The Funds are managed by their Boards of Trustees which act as the "plan sponsor" as defined in 29 U.S.C. § 1002(16)(B)(iii).  Under ERISA, the Trustees, as fiduciaries, are required to administer the Funds "solely in the interest of the participants and beneficiaries" and "in accordance with the documents and instruments governing the [Funds]" and they have brought this action to comply with their fiduciary obligation to ensure that participants receive the contributions to which they were entitled. 29 U.S.C. § 1104(a)(1).

3.     Hundreds of employers participate in the Funds, each having an obligation to contribute under 29 U.S.C. § 1145.  These employers are signatories to collective bargaining agreements with specific Laborers locals which negotiate only a sum of money to be

contributed to the Funds as required by the Trust Agreements.  The Funds receive contributions from participating employers pursuant to their collective bargaining agreements.

4.      Each month, participating employers complete Employer Report Forms in accordance with the Funds' rules listing the names of eligible employees, hours worked and contributions due and owing.  The employers then remit these self-reported Forms and contributions to the Funds for processing.  The Funds then pay pension, disability and health benefits to thousands of qualified participants and their dependants who satisfy the Funds' eligibility requirement.

5.      Defendant USA is a Virginia corporation, incorporated in 1991.  Its home office is located in Warrenton, Virginia, and until January 1, 2005, it maintained a branch office in Saquoit, New York.

6.      USA provides environmental abatement and remediation services, including the abatement of hazardous substances such as asbestos and lead, as well as selective demolition.

7.      Similarly, Defendant Comet provides environmental abatement and remediation services as well as selective demolition.  Comet was designed to perform the same type of work that USA performed, but for jobs that required union-only contractors.

8.      Comet was organized as a Virginia limited liability company in 2000, with Victoria Sullivan, wife of USA president Jeffrey A. Sullivan, as 99% owner.

9.      Prior to the time that Comet entered into a broad, comprehensive collective bargaining agreement, USA had always been a non-union employer.  From time to time, USA has entered into "project specific" agreements with unions, the scope of which is limited to a specific project on which USA has contracted to perform services.

10.     Jeffrey Sullivan is the president and co-owner of USA. Mr. Sullivan wrote the check representing his wife, Victoria Sullivan's, capital contribution. Mr. Sullivan was also listed as a member of Comet on Comet's bank's signature card. A signature stamp of Mr. Sullivan's name was used for the vast majority of all of the checks issued by Comet.

11.     Victoria Sullivan is the vice-president and co-owner of USA. In addition, Mrs. Sullivan was the 99% owner of Comet and, according to numerous documents filed with federal and state governmental entities, was also represented as the managing member of Comet. Although Mrs. Sullivan worked only part-time at best, she was paid as a full-time employee of USA at a salary of $52,000.00 per year. Mrs. Sullivan played virtually no role in Comet's business operations, and her capital contribution to Comet of $500 was paid by her husband Jeffrey Sullivan.

12.     David Kelsey is a director and risk manager of USA, and has been employed by USA since 1998. Mr. Kelsey and Mr. Sullivan are close friends going back to when they were roommates in college. Mr. Kelsey also owns a 1% interest in Comet. As an officer and employee of USA, Mr. Kelsey's salary was always paid by USA. At the same time, however, Mr. Kelsey was the person who ran all of Comet's day-to-day operations. According to Mr. Kelsey, even though Mrs. Sullivan purportedly was Comet's 99% owner, he said that the only person he worked for was Jeffrey Sullivan, "because he's [the] only one there I would listen to." Kelsey Dep. at 56, ll. 18–21.

13.     Anita VanSice was USA's controller for approximately 13 years prior to her resignation, a few weeks after her deposition in this case. Ms. VanSice became a 10% owner of USA in 2001, and sold back her 10% interest to the Sullivans at the time she resigned in November, 2004. Although Ms. VanSice was at all times an employee of USA and was paid her salary

by USA, she performed virtually all of the financial responsibilities required for Comet's operations including, but not limited to, transferring funds between USA's and Comet's bank accounts, processing payroll information, drafting payroll and vendor's checks, and signing Victoria Sullivan's name to Comet documents that were filed with federal and state governmental authorities.

14.     Robert Giroux was employed by USA as an estimator.  In this capacity, Mr. Giroux developed business opportunities and prepared USA's bids for prospective work.  Although Mr. Giroux received his salary from USA, he also performed work for Comet, including playing a key role in developing the business opportunity that prompted USA's decision to use Comet as "a union vehicle in order to perform the [union only] work."  Giroux Dep. at 78, ll. 20–21.  Although Mr. Giroux was always an employee of USA, and never held any position with Comet, he executed two separate collective bargaining agreements, and did so only because his boss, Mr. Sullivan, wanted him to do so.

15.     Jeffrey Scott Jones is the nephew of Jeffrey and Victoria Sullivan and has been employed by USA since 1994.  Although Mr. Jones was at all times an employee of USA and always received his salary from USA, Mr. Jones performed extensive services for Comet including, among other things, the preparation of bids for prospective Comet projects and collecting Comet's mail from its stated business address, a Mail Boxes Etc. store.

16.     USA entered into a Project Agreement with the Laborers' District Council in 1999 for work at the Pentagon, which applied only to employees working on the project, and which expired when the project was completed.

17.   USA, through its New York office, has entered into several project specific agreements with labor unions, which were limited in scope to employees working on the project, and which expired when the project was completed.

18.   USA is not a signatory to the collective bargaining agreement which is the subject of this litigation.

19.   In 2001, Comet entered into a subcontract for a demolition project at Gallery Place in Washington, D.C.  Only union labor was allowed to work on the project by the property owner.  Mr. Sullivan and Mr. Giroux had discussed the possibility of creating a new union company that would be able to perform the work on Gallery Place.  Mr. Kelsey informed them that "there was already a company in existence"—Comet.  Giroux Dep. at 83, ll. 2–6.

20.   On July 17, 2001, Comet entered into a collective bargaining agreement with the Laborers' District Council, which expired by its terms on May 31, 2002.  On June 1, 2002, Comet signed a renewal of the same collective bargaining agreement, extending its termination date to May 31, 2005.  The collective bargaining agreement was not a "project specific" agreement of the type occasionally entered into by USA.  Rather, the agreement obligated Comet to pay union wages and to contribute to the union funds for all labor performed by its employees within the scope of the collective bargaining agreement.

21.   USA was in negotiations with the Gallery Place project developer months before Mr. Sullivan decided to have Comet enter into the collective bargaining agreement.  Comet had nothing to do with the preparation of the bid, and Messrs. Giroux and Sullivan as representatives of USA were the ones who secured the work and reached the agreement for Comet to perform the work on the Gallery Place project.  Giroux Dep. at 77, ll. 7–22; 86, ll. 6–7; 87, ll. 1–5.

7

22.     Comet completed the Gallery Place project, and it performed four other projects on a
building located at 2100 M Street in Washington, D.C. and one other small job in the District
of Columbia.

23.     In 2001, Comet generated gross revenues of under $300,000, and in 2002, the gross revenues
were under $10,000.  As of the date of the hearing on liability in January 2006, Comet had
not filed its tax return for 2003.  Its total gross revenues from 2001 to 2003 were under
$500,000.  Comet ceased doing business in 2003.

24.     Comet was insured on USA's account.  Mr. Sullivan testified that the reasons for this were
common ownership and the close relationship between the companies.  In a letter dated July
16, 2001, Mr. Kelsey instructed USA's insurance broker to "add Comet Contracting, LLC
as a permanent additional insured to the USA Remediation Services, Inc. Commercial
General Liability Policy."  P.'s Exh. 13, Letter from Kelsey to Izard (emphasis in original).

25.     Comet's original business address was Mr. and Mrs. Sullivan's home residence.  Comet's
business address was later changed to a Mail Boxes Etc. location which listed the address
as a "Suite" instead of the mail box number.  Although Mr. Sullivan claims that he was never
an owner or employee of Comet, he nevertheless turned in expense reports for
reimbursement of Comet-related activities at Gallery Place.

26.     USA's owners and officers admitted at their depositions that Comet's operations were run
by David Kelsey, with considerable assistance from Ms. VanSice, out of USA's headquarters
in Warrenton, Virginia.  VanSice Dep. at 20, ll. 6–20; Kelsey Dep. at 29, ll. 20–22.  Comet
had virtually no equipment of its own, but rather used USA's equipment for whatever its
jobs needed.  Mr. Sullivan testified that he "would let Comet use anything it needed. . . .
[W]e did a project that part of USA's compensation was . . . a transfer of equipment. . . . So

. . . whatever Comet needed, they could help themselves to."  J. Sullivan Dep. at 201, l. 14 to 202, l. 2.

27.    Bids that were submitted by Comet showed its interrelationship and single-employer status with USA, because they were being submitted by USA employees on Comet's letterhead with a provision stating that "USA will perform the work scope as described for the lump sum of . . ." or "USA shall provide sufficient management, supervision, labor, [etc.] . . ." P.'s Exh. 15, Letters from USA to secure work for Comet.

28.    Ms. VanSice, as USA's Controller, was responsible for ensuring that both Comet's and USA's financial responsibilities were handled properly.  She had to transfer large sums of money from USA to Comet (and then from Comet back to USA) for virtually all of Comet's financial needs, including making payroll and paying vendors.  VanSice Dep. at 160, l. 17 to 161, l. 5; P.'s Exh. 14.

29.    There were no promissory notes or notes payable of any kind reflecting an obligation to repay the sums transferred from USA to Comet or whether any interest was assessed. Accounting records reflected a note payable, but there was no note.   VanSice Dep. at 211, ll. 7–17.  According to Ms. VanSice, Mr. Sullivan was the person who authorized her to transfer funds from USA to Comet for "[e]ach individual" transfer.  *Id.* at 160, l. 17 to 161, l. 5.  When asked what was USA's interest in "seeing that Comet was able to make its payroll," VanSice testified that USA funded Comet "[b]ecause Mr. Sullivan was an owner of Comet Contracting."  *Id.* at 195, ll. 4–18; 197, ll. 1–20; 199, ll. 4–22.

30.    An administrative services agreement between USA and Comet was "never reduced to writing."  Comet transferred all of its profits to USA pursuant to the unwritten administrative

services agreement.  This had the effect of reducing Mr. and Mrs. Sullivan's personal taxes because the money was distributed to USA instead of Mrs. Sullivan.

31.     Mr. Sullivan stated that "Comet didn't exist but for the name. . . . Comet was essentially . . . USA staff performing all the functions of Comet, whenever it had [its] limited need for any payroll or whatever."  J. Sullivan Dep. at 129.

32.     USA's owners, officers, and employees ran every facet of Comet's operations.  Mr. Kelsey and Ms. VanSice were the USA owners and officers most involved in the day-to-day business operations of Comet, conducting all of its management functions out of USA's headquarters.  In this regard, Ms. VanSice "regularly represented to people outside of USA and Comet that [she] was the controller for Comet."  VanSice Dep. at 139–140.  On the job sites, Comet used USA's supervisors to oversee its jobs.  Mr. Sullivan was represented by Mr. Kelsey to be a Vice President of Comet, at least where it served a business purpose of USA, such as helping collect funds owed to Comet because those funds were in turn owed to USA.

33.     Comet's labor relations were controlled entirely by USA's owners and officers.  Comet entered into collective bargaining agreements when Robert Giroux, an employee of USA, executed the labor agreements at the direction of his boss, Mr. Sullivan.  Mr. Kelsey was responsible for the day-to-day issues relating to labor relations and staffing.  In at least one instance, Mr. Sullivan instructed Mrs. VanSice to hold off issuing payroll checks to Comet's employees.

## CONCLUSIONS OF LAW: LIABILITY

In light of the foregoing, USA stipulates that "plaintiffs will prove the four elements needed to make a finding that USA and Comet constituted a single employer: 1) the interrelationship of operations; 2) the presence of common management; 3) the presence of common control of labor relations; and 4) the presence of common ownership. *See [Trs. of the Nat'l] Automatic Sprinkler [Indus. Pension Fund] v. Zengel Bros., Inc.*, 911 F.2d 725 (4th Cir. 1990)." D.'s Proposed Findings of Fact and Conclusions of Law (Paper No. 78), ¶ 13.

According to the Funds, this stipulation resolves the one issue in the liability phase of trial: if USA and Comet constitute a single employer, the Funds argue, then USA is bound by the Comet collective bargaining agreement and is liable. The only remaining issue—for the damages phase—is to count the number of covered employee-hours and the fund contributions thereon. USA, on the other hand, argues that in addition to a finding that USA and Comet were a single employer, the Court must also determine whether USA and Comet constitute a "single appropriate bargaining unit"—and that this determination cannot be made in this proceeding, but instead falls within the exclusive subject-matter jurisdiction of the NLRB.

As this Court has previously indicated on the record in this case, *see* Transcript of Motions Hearing (Paper No. 64) at 82, ll. 9–22, the bargaining unit determination is not one that needs to be made in the context of this suit. USA cites a litany of cases in which courts have approached the questions of (1) whether two companies constitute a single employer and (2) which employees constitute an appropriate bargaining unit as two prongs of a single inquiry. *E.g.*, *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 505 (5th Cir. 1982). However, these cases have generally involved a suit by a labor union, under the Labor Management Relations Act or similar statutes, to enforce its own collective bargaining agreements and either force an employer

to deal with the union or to refrain from using a second corporation to hire non-union labor.  *E.g.*, *id.* at 497–99; *Walter N. Yoder & Sons, Inc. v. Sheet Metal Workers' Local Union No. 100*, 661 F. Supp. 1141 (D. Md. 1987).  The purpose of inquiring into the appropriate bargaining unit, rather than merely ending the inquiry with an examination of whether the two companies should be treated as one, is "to protect the rights under section 7 of the NLRA, 29 U.S.C. § 157, of the employees of each of the subentities constituting the single employer to bargain collectively with representatives of their own choosing."  *Carpenters Local Union No. 1846*, 690 F.2d at 507.  In other words, the fact that two companies are managed jointly, such that they are appropriately treated as a single employer and bound by the same contracts, does not imply that the employees of each company have sufficiently common interests that they would or should choose to be represented by the same union.  Thus, before allowing a union to represent employees of the non-union subentity, a court must ensure that the two companies are one not just from the standpoint of management, but also from the standpoint of the employees themselves.

Here, in contrast, the conduct of the non-union company's labor relations is not at issue; rather, third parties—multi-employer employee benefit funds—are seeking monetary relief on a pre-existing, enforceable contract from the two corporations that constitute a single employer.  Neither the union, the National Labor Relations Act, nor any representational issues are directly implicated.  The question of what constitutes an appropriate bargaining unit is supplanted by the question of which employees and jobs are covered by the contract that gives rise to USA's and Comet's pension obligations—a question that can and should be resolved during a payroll audit rather than as a question of liability.  *See Trs. of the Nat'l Auto Sprinkler Indus. Pension Fund v. Budget Plumbing Corp.*, 111 F. Supp. 2d 716, 719 (D. Md. 2000) (stating that where two companies constitute a single employer they are "therefore[] jointly and severally liable for delinquent [employee benefit fund]

12

contributions"); *see also Vance v. NLRB*, 71 F.3d 486 (4th Cir. 1995) (affirming an NLRB determination, which had made no inquiry into the appropriate bargaining unit, that the two companies constituting a single employer were jointly liable for damages resulting from unfair labor practices).   Thus, as the Seventh Circuit has observed, courts "need not decide representational issues to impose liability for contributions to a multi-employer plan." *Moriarty v. Svec*, 164 F.3d 323, 334 (7th Cir. 1998).

In *Moriarty v. Larry Lewis Funeral Dirs.*, 150 F.3d 773 (7th Cir. 1998), the court of appeals considered a question essentially identical to the one presented here and reached the same result. In *Larry Lewis*, a unionized funeral home made employee benefit contributions, as required by its collective bargaining agreements, on behalf of its own principals and employees, Larry and Gina Lewis.  150 F.3d at 775.  Eventually, the funeral home went out of business; when it did so, the Lewises went to work for another funeral home, of which Larry ultimately became the owner and manager. *Id.* The second funeral home continued to make fund contributions on behalf of Larry and Gina, but did not do so on behalf of any other employee; consequently, the funds sued under the collection provisions of ERISA—the same cause of action as in the instant case—alleging that the two funeral homes constituted a single employer and that the second home owed contributions for all of its employees, not just the Lewises.  *Id.*  The district court dismissed the suit for the reason advanced by USA: it held that it lacked jurisdiction to determine the appropriate bargaining unit. *Id.* at 776.

The Seventh Circuit reversed.   It observed that the determination of an appropriate bargaining unit had no

> relevance to a suit under the collection provision of ERISA, 29 U.S.C. §
> 1132(e)(1).   No employee wants to change bargaining representatives (or
> decertify a union); no one contends that an unfair labor practice has been

committed; the NLRB therefor has no role to play.  The Funds' claims are based
on contracts rather than principles of labor law.  Sometimes it is hard to tell
whether a particular firm is a party to the contract; that is the problem this case
poses, and it may be resolved without regard to the NLRB's principles of unit
determination.

*Id.*  The reasoning of the court of appeals applies equally here: this Court has determined that USA

and Comet are a single employer, and that determination is all that is necessary to hold USA liable

under the terms of the collective bargaining agreement.  The remaining question is which employees

those terms cover—a question of damages and contract law.

Even if a separate inquiry into the appropriate bargaining unit were necessary, this Court

finds, as an alternative holding, that it has jurisdiction to make such a determination and that the

relevant employees of Comet and USA constitute an appropriate bargaining unit.

This Court has jurisdiction to decide the appropriate bargaining unit because it "may decide

labor law questions that emerge as collateral issues in suits brought under independent federal

remedies."  *Connell Constr. Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S.

616, 626 (1975); *see Carpenters Local Union No. 1846*, 690 F.3d at 519 (holding that "where

collateral issues of labor law, such as the determination of the appropriateness of a bargaining unit,

become essential to the determination of the existence of a breach of contract under [an] independent

federal remedy, . . . a federal court may pass upon this issues . . . notwithstanding the fact that a unit

determination by the Board might be available if one of the parties filed an unfair labor practice

charge or sought unit clarification").[1]

---

[1]*South Prairie Constr. Co. v. Local No. 627*, 425 U.S. 800 (1976), though a Supreme
Court case decided after *Connell*, is not to the contrary.  In it, the Supreme Court reversed the
U.S. Court of Appeals for the D.C. Circuit after that court had failed to let the NLRB determine
the appropriate bargaining unit in the first instance.  *Id.* at 803–04.  *South Prairie*, however, was

To determine whether the employees share a community of interests and thus constitute an appropriate bargaining unit, the NLRB (or a court) looks to "such factors as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function, and degree of employee interchange." *NLRB v. J.C. Penney Co.*, 559 F.2d 373, 375 (5th Cir. 1977). Here, USA employees have little bargaining history; only Comet is unionized, and indeed was created specifically to perform jobs that required union workers. But as to the remaining factors—geographic proximity, common supervision, job function, and employee interchange—USA and Comet overlap entirely; USA and Comet were operated to do the same types of jobs, with the same equipment and employees, under the same roof.

Accordingly, even if this Court had to make a bargaining unit determination, it would conclude that the Comet and USA laborers constitute one bargaining unit and that the collective bargaining agreement applies to workers on both Comet and USA jobs. USA and Comet are jointly and severally liable; the remaining question is for how much, and that depends on how many hours were worked on jobs covered by the collective bargaining agreement.

## DAMAGES

Although the audit process was unnecessarily contentious—requiring intervention from the undersigned on two occasions—an audit report was completed and provided to USA by the specified deadline. The final version of this report, dated March 1, 2006, calculated that 413,752 hours of labor were covered by the collective bargaining agreement but had not been reported to the union,

---

an appeal from an NLRB determination; the D.C. Circuit could and should have remanded. *See id*. at 804–06. In other words, *South Prairie* stands only for the "basic principle that an agency should be afforded the opportunity to decide a factual issue before the issue is decided by an appellate court." *Brown v. Sandino Materials*, 250 F.3d 120, 129 (2d Cir. 2001) (discussing *South Prairie*).

and that no contribution payments had been made.  At a contribution rate of $2.95 per hour,[2] this

yielded $1,220,568 in unpaid contributions.  Adding liquidated damages at a rate of 15% ($183,085)

and interest of $335,475, the report calculated total damages of $1,739,128.

Unfortunately, this final version of the audit report was not provided to the defendants until

the day of the damages hearing; what the defendants received in a timely fashion was a preliminary

version dated February 23, 2006.  As counsel to the Funds explained during the damages hearing,

this preliminary version identified a substantially lower number of covered hours because, between

the preliminary and final versions, the auditor was able to identify for the first time the geographic

location at which some of the laborers' jobs had taken place.[3]  The preliminary version excluded

these jobs from its calculations because of the possibility that they were outside the scope of the

geographically-limited collective bargaining agreement; the final version included additional jobs

that had been identified as falling within that scope.  Thus, the preliminary version counted only

262,017 covered hours, yielding $772,954 in unpaid fund contributions.  Adding  liquidated

damages of $115,943 and interest of $235,998, it calculated damages of $1,124,898.

---

[2]The third-party administrator for the Funds, Carday Associates, provided this figure to
the auditor.  It represents the total of the contribution rates for each relevant fund during the
covered period: $1.65 for the Laborers' Health and Welfare Fund, $0.90 for the Laborers'
Pension Fund, $0.30 for the Laborers' Training Fund, and $0.10 for the Laborers' Employers'
Cooperative and Education Trust.
    The audit report also includes a line-item for the "Health & Safety Fund" of $0.02 per
hour, but for reasons that are not clear to the Court this was apparently not included in the $2.95
total.  Because Plaintiffs supplied, and Defendants did not challenge, the $2.95 total, the Court
will adopt this figure.

[3]As far as this Court is aware, the final report only added jobs to the list of covered jobs;
it did not subtract any.  Thus, every job counted in the preliminary report was counted in the
final report, but the converse is not true: not all jobs counted in the final report were counted in
the preliminary one.

Whatever the reason for the Funds' failure to provide the final report until the damages hearing, the failure denied USA the opportunity to effectively challenge the greater damages that the final report contained.  This Court ordered that the audit report be turned over to USA on or before March 3, 2006; that USA have the opportunity to challenge specific findings in the report within 20 days; and that USA have the opportunity to depose the auditor on or before April 7, 2006. *See* Order of Jan. 25, 2006, Paper No. 87.  As it happened, USA did not make any specific challenges to the report it received at all, nor did it choose to depose the auditor, but this Court cannot assume that it would not have done so if it had timely received the final report containing additional jobs and greater liability.  Because the use of the final report would therefore prejudice USA, this Court accordingly declines to consider the findings in the final report, and instead adopts the findings of the preliminary audit report.

As mentioned, USA declined to make any specific challenges to the auditor's findings. Instead, it submitted (to both the Court and to the Funds) a list of general objections.  *See* Paper No. 89 (objections); Paper No. 90 (supplemental objections).  Aside from its ongoing objection to the jurisdiction of this Court to make a determination of an appropriate bargaining unit, *see supra*, USA objects to (1) the inclusion of general laborers in the listing of Health and Welfare and pension contributions, even though Health and Welfare and pension contributions "shall not apply to General Laborers" under the collective bargaining agreement; (2) the failure to account for a lower rate of contribution as to construction laborers; (3) the failure to reflect a credit for contributions paid by Comet; (4) the absence of "supporting documentation" required by the January 26, 2006, Order of this Court; and (5) the failure of the auditor's estimation techniques to account for projects in which the labor was subcontracted to other companies.

17

This Court advised USA, during a telephone status conference well in advance of the damages hearing, that its objections were not challenges to "specific findings" within the meaning of this Court's Order of Jan. 25, 2006.   USA's noncompliance with the Court's orders is reason enough to overrule its objections.

Even addressing them on the merits, however, this Court overrules each of them.  The Funds' auditor performed a thorough audit of USA's payroll weekly job tickets, weekly job summaries, payroll reports, and tax forms.  Its audit report accounted for each hour worked on each covered job within the geographic scope of the collective bargaining agreement, and provided thorough documentation, thus meeting this Court's requirement that the Funds provide "supporting documentation."  The report counted only job tickets falling within specific job descriptions (such as asbestos abatement or mold removal) that fall within the collective bargaining agreement.  Audit Rep. at 2.  Some hours worked could not be identified as belonging to a covered job description, and some jobs did not have any hours listed, but in each case, the auditors' report excluded damages that may have arisen from these unknowns.  *Id.*  The audit report, then, amounts to uncontradicted evidence; USA has pointed to no specific job hours that should be excluded or accounted for at a lower rate, whether because of subcontracting, work done by general laborers, or work done by construction laborers.   Instead, it has made only vague allegations that the audit was done incorrectly.  This is not evidence, nor is it even a well-formed objection.

Accordingly, the findings of the preliminary audit report are adopted by this Court, and Comet and USA will be held jointly and severally liable in the amount that the preliminary report reflects: $1,124,898.  If anything, this is an underestimate, because of the  failure of the Funds to deliver the finalized report and because of the auditor's conservativism.  Judgment will be entered in favor of the Funds by separate order.

__ July 25, 2006 __                                    _____/s/_____
DATE                                                              ROGER W. TITUS
                                                              UNITED STATES DISTRICT JUDGE